I'm a student with the Innocence Project Northwest at the University of Washington School of Law. I represent petitioner Mr. Anton Barker. You're Ms. Halm, you say? Ms. Halm, thank you. At this time, I'd like to reserve eight minutes for rebuttal. One question defines the dispute in this case. Is this verdict worthy of our confidence? Mr. Barker's conviction rests on the testimony of two witnesses. The first, Raul Obundis, a jailhouse informant. And the second, Shanice Brown, the victim to a crime perpetrated by a man wearing clown paint, a kerchief up to his eyes and a hat down to his brow. At the first trial, without the testimony of the informant, the state could not meet its burden, and the jury hung, notwithstanding Mr. Barker's pro se defense. Against this evidentiary record, does confidence in the verdict still stand, given that the state prevented the jury from hearing the following? That the star witness, Raul Obundis, had four prior convictions, all within a year of the trial, all four admissible as crimes of dishonesty, two for lying to police officers. The jury also did not know that the state began meeting with Obundis not by happenstance in mid-July, but as early as mid-June during the first days of Mr. Barker's first trial. The jury also did not know that the state dropped another of Obundis' charges of residential burglary, despite a probable cause hearing to detain and a $20,000 bail. Taken together, this evidence is material. It shakes the confidence in the verdict for three primary reasons. First, the withheld evidence establishes that Obundis has a propensity to lie. Mr. Obundis is the difference between conviction and a hung jury. He is determinative of guilt or innocence. Therefore, any additional impeachment evidence to his testimony takes on even greater importance. It is by this rationale that the Supreme Court in U.S. v. Giglio and Kyles v. Whitley and why this Court in Benn v. Lambert held that the evidence was material against the star witness in the State's case. Let me ask you, it seemed to me the jury had plenty of evidence that Mr. Obundis is a bad guy. You know, he lied to police officers on at least two occasions, so they knew he's not a truthful guy. They knew he was drug sick. He had this cocaine habit. They knew he was violent and that people had wanted, you know, he and Mr. Barker had it out with each other. They knew that he'd gotten a deal, that he wasn't going to testify unless he got a deal from the prosecutor. So it's difficult to see how having these quite minor misdemeanors would do much to make that pretty bleak picture any worse. And I'd appreciate your response to that. It's the second reason why the evidence in this case is material, and that is because the withheld evidence makes both of the confessions that Mr. Barker allegedly confessed to Mr. Obundis nearly physically impossible. One withheld conviction, standing alone, puts Mr. Obundis behind bars from March 29th to April 9th. Now, Mr. Obundis testified at trial that Mr. Barker confessed to him behind a Yakima motel on the outside sometime around the first week of April. So it winnows the time between from 10 days to 32 hours in which that confession could have taken place. A reasonable jury could conclude that confession never happened. But don't you have to factor into that point the timing of when it was announced? He didn't even know about this burglary, but then it was announced on television. So if you chop off those days, you don't really have this 10-day problem that you're talking about. I mean, the Court of Appeals Division III went through all of that pretty carefully, didn't they? Well, again, the jury heard it was around the first week of April. There was no cross as to when Mr. Obundis read a newspaper. So the jury was presented with a 10-day window and not presented with the fact that Mr. Obundis would have been behind bars for 9 of the 10 days. So it was up to the jury to determine whether or not Mr. Obundis was lying about that first confession. As to the second confession that Mr. Obundis testified to on June 14th at 10.30 a.m., I would like to use the timeline with the permission of the Court just to illustrate because the dates get a little confusing. Obundis testified that Mr. Barker confessed to him at 10.30 a.m. on June 14th. However, this date withheld the fact that Obundis was in a probable cause hearing at 10.30 a.m., precisely the time that Mr. Barker allegedly confessed to him. A reasonable jury concluded that second confession also never happened. The third reason why the evidence is material in this case is that because it undermines the caliber of the State's investigation and sullies the credibility of individual officers. The State withheld the fact that the lead detective, Detective Salinas, in Mr. Barker's case, had an ongoing relationship with the jailhouse informant, Mr. Obundis, the linchpin witness, starting at least in mid-June. They met on June 14th, the day of the alleged confession. Sometime after Mr. Obundis testified that he allegedly heard this confession, however, did not mention that confession at his meeting with Detective Salinas, notwithstanding the fact that he was drug sick, desperate to get up from behind bars, and facing a steep charge with a $20,000 bail. Detective Salinas was the clown robbery investigator who told the victim, I think I know who did it. From this withheld evidence, a new jury could infer that Salinas started negotiating a deal with Obundis in mid-June, not in mid-July, as presented at trial when the State testified that they ran across Mr. Obundis by happenstance. A new jury could reasonably conclude that the residential burglary was part of the deal. The residential burglary was dropped two days after, despite that steep bail. Is there any evidence that – I mean, it's two different prosecutors. Is there any evidence of any deal by the prosecutor in the case for Mr. Barker? Detective Salinas, the lead investigator, recommended that the charge be dropped. So he's a key player in not only the dropped charge, but also in Mr. Barker's case. No, that doesn't answer my question. My question is, the decision to give a defendant a deal rests with the prosecutor, not with the investigator. And the decision – is there any evidence of any – that the prosecutor in Mr. Barker's case had anything to do with this residential burglary charge? Mr. Ken Ram, the lead prosecutor in Mr. Barker's case, his name is on the dismissal of the charge. At this time, what we know is the lead detective met with Abundes, dropped the charge, notwithstanding the steep bail. It is up for a reasonable jury to determine whether or not that charge actually was part of a deal negotiated in mid-June. A new jury could also reasonably conclude that the investigation was desperate for a verdict. A new jury could reasonably question the credibility of the entire investigation team and infer that Abundes' testimony was orchestrated by the Yakima PD. If materiality analysis, according to the Supreme Court, is rooted in an overriding concern with the justice of guilt, this case must be considered in light of the withheld evidence, not item by item, and measured against the scant evidentiary record to start with. It is for this reason that the Washington Supreme Court's decision to deny the writ of habeas corpus through its commissioner was contrary to an unreasonable application of Federal law. The Washington Supreme Court applied a standard contrary to Federal law in two ways. First, instead of applying the rule of Brady and its progeny, a three-step analysis, the Washington Supreme Court, through its commissioner, applied the equivalent of a fourth step of actual and substantial prejudice. I'd like to direct the Court to the excerpt of record at page 172, in which the commissioner states, and since this is a personal restraint petition, even if error occurred, the burden rests on Mr. Barker to show that he was actually and substantially prejudiced. So it didn't matter that Mr. Barker could show he did not get a fair trial, that he showed constitutional error. He also had to show actual and substantial prejudice. This steep hurdle is directly analogous to the wrong materiality standard applied by the Oregon courts in Bailey v. Ray and the wrong prejudice standard applied by the Virginia courts in Williams v. Taylor. Notably. What court do we review on this point where we have the substantive decision from the Washington Court of Appeals we have only, in effect, a denial of cert, so to speak, from the Washington court commissioner and not from the Supreme Court itself? In Riley v. Payne, a decision by this court, the court looked to the commissioner's denial of review, which was adopted wholesale by the Washington Supreme Court when they denied the motion to re-look at the issue. This commissioner decision is seven pages long. He does address the facts of the case. He then goes into the materiality analysis in full. Notably, in the seven-page ruling by the commissioner, he fails to cite any of the U.S. preeminent Brady cases. He fails to cite Giglio, Eggers, Eggley, Kiles, or Brady itself. He cites merely Tobin v. Lambert. The second reason why the standard was contrary to Federal law in that decision, the commissioner also placed the Brady obligation on defense counsel. He states at the exeter record again at 172, there is no constitutional violation if the defendant could have obtained the evidence using reasonable diligence. This statement, citing to a Washington case, is in direct conflict with Federal law. Defense counsel is not required, after reasonably relying on court-ordered discovery in this case, to go fishing for additional Brady material. The duty rests on the prosecution under Brady. The Washington court also unreasonably applied the governing Federal standard to the facts of the case. The clear holding of Kiles is that materiality turns on the cumulative or net effect of all the suppressed evidence in light of the nature of the strength of the case at trial. Also, Bailey cites this fact at page 1, 1019 of that decision. The Washington court looked at each selective bit of withheld evidence and then one by one states Mr. Barker failed to show actual or substantial prejudice. The commissioner does so, failing to cite the fact that there was a probable cause hearing, failing to cite even the fact that the lead detective met with Salinas, and failing to cite the fact that one conviction makes that first confession almost impossible. Simply stated, it is objectively unreasonable to conclude that Mr. Barker received a fair trial. The appropriate context in this case is a hung jury in the first trial, the lack of any physical or forensic evidence, the unconvincing eyewitness identification, the withheld evidence that dismantles the star witness of Bundy's. It makes the confession nearly impossible and highlights suspicious dealings between the State and their star witness. If there are no more questions from the panel, I'd like to reserve the remaining time for rebuttal. You may. Thank you. May it please the Court. My name is Greg Rosen. I'm an assistant attorney general and I represent the Respondent Gary Fleming in this matter. This Court should affirm the decision of the district court dismissing Mr. Barker's petition because the decision by the Washington State courts in his case was not contrary to or an unreasonable application of clearly established federal law. First, the prosecutor's failure to disclose informative Bundy's for Mr. Buehner convictions was not material. The U.S. Supreme Court has held that evidence is material if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. In light of the vast amount of impeachment evidence that came out in Mr. Barker's trial as to Mr. O'Bundy's past wrongdoings, this Court cannot find that there is a reasonable probability that the result would have been different. In Mr. Barker's trial, the jury heard Mr. O'Bundy's impeached in numerous ways, and the result of that impeachment is that the jury heard Mr. O'Bundy's essentially to be a repeated liar, a career criminal, a drug addict who came forward with a confession when he had to get out of jail because of his drug sickness that Mr. O'Bundy's hated Mr. Barker. And yet they may have believed him. That's true. Nothing different between the second trial and the first trial was O'Bundy's testimony.  That's correct as to the witnesses, Your Honor. However, there were two entirely different jury panels between the first trial. And as the Court is well aware, the same evidence can hit different jurors differently. And you have 12 entirely different jurors on each of the two trials. So although it's somewhat simplistic to say, well, they hung with the first case, convicted with the second, and the only difference was O'Bundy's testimony, although that's true as to the witnesses. You've got two, 12 different people in each case. That could have rejected O'Bundy's testimony and still convicted. I'm sorry, Your Honor? The jury could have rejected O'Bundy's testimony and still convicted the defendant. That's correct, Your Honor. There was evidence submitted during Mr. Barker's second trial and the first that Shanice Brown, the clerk that was robbed by Mr. Barker, identified him in a photo montage. In fact, if the Court will look to SCR 311-12, Ms. Brown testified twice that in the photo montage, it took my breath away, end quote. And the speed with which she identified Mr. Barker during that photo montage indicates that that is very powerful evidence. Additionally, Ms. Brown testified at Mr. Barker's trial that she observed him for at least two minutes during the time that Mr. Barker robbed her, that she had a class in drawing human anatomy, and that she testified that part of the human anatomy that was drawn are faces. But there were a lot of inconsistencies in her identification, were there not? There were, Your Honor. There were. The height and the age, being mid-20s as opposed to 37, not noticing tattoos and that sort of thing. That's correct, Your Honor. And despite that fact, the jury found Ms. Brown's testimony, we would assume, persuasive. And they also found Mr. Abundee's testimony also persuasive, despite the fact that he was heavily impeached. Now, opposing counsel has a ---- Let me ask you, just to get us on the same playing field, do you agree that it's the Washington Supreme Court decision that we're reviewing? 2254 talks about the Washington ---- about the State court's decisions. Now, the Washington Supreme Court Commissioner's purpose in making his decisions regarding rulings as to review is to determine whether the full court should hear the case. Consequently, whether he's reviewing the merits or not is questionable. The Washington Court of Appeals is also, obviously, a State court. And under 2254, this Court must decide whether the decision of the State courts was contrary to or reasonable application of clearly established Federal law. Now, does the Washington Court of Appeals ---- Well, that doesn't do me any good. And let me tell you why. Because the ---- it seems to me that they use two different standards here. And I recognize there were a lot of issues, most of which have fallen away at this point. Yes, Your Honor. But on the Brady issue, it seemed like the Washington Court of Appeals used the correct standard and the Supreme Court used the incorrect standard. So what do you do about that? Well, if Your Honor is referring to the actual prejudice standard ---- Yes. We're talking apples and oranges, essentially. The actual prejudice standard is your standard which is required for a Petitioner to obtain collateral relief in State court. That's the burden of proof that they bear in State court. It doesn't mean that the decision requiring a State court collateral Petitioner to obtain relief in State court to establish actual prejudice and bearing that burden of proof means that the decision by the Washington Supreme Court Commissioner was contrary to or unreasonable application of clearly established Federal law, whether it's we're talking Brady or Kyles or Giglio.  Even though, let me just ask you this. If the Brady rule is that you don't have to show actual prejudice but just some reasonable probability that it might have come out different, if that's the Brady rule, which is a Federal rule, and they don't apply that, then why isn't that contrary to U.S. Supreme Court law? In my view, the Washington Supreme Court Commissioner and the Washington Court of Appeals correctly applied clearly established Federal law. And if the Court will review the Washington Supreme Court Commissioner's decision and the Court of Appeals decision. We have. That's my problem. You haven't really answered my question. If Brady requires – you know, Brady is different than most of the other kinds of errors that are – that come up on either direct or habeas review. And if it requires, in effect, a lesser standard, then why can you say that it's okay for the Washington Supreme Court to impose a higher standard? What I'm trying to explain to the Court, and perhaps not doing artfully, is the standard applied by the Washington Supreme Court Commissioner was not the Brady standard, not the three-step test that the evidence has to be favorable, suppressed, and material. I submit that he did so. The Court is claiming – I think the Court is stating that the additional standard, if you will, of actual prejudice is being heaped on the three-step Brady test, thus making the Washington Supreme Court Commissioner's decision contrary to U.S. Supreme Court precedent. And what I'm trying to tell the Court is that the Supreme Court Commissioner's application of the actual prejudice standard is simply requiring a State court collateral Petitioner to meet their burden of proof in State court. You're saying you go through the three Brady requirements, he doesn't meet that, you throw out the Federal claim, and then you go on and say there's no prejudice and you throw out the State claim. What I'm saying is that a State court collateral Petitioner, we have an individual in State court who files a personal restraint petition. That person, for example, we're dealing with a Brady test. He's got to show the three steps, by the way, that I just articulated. Right. And as a State court collateral Petitioner, he must establish in State court actual prejudice as well. That's his burden of proof. If he's failed to show the first three, why would he even go to the four, even under the State law? That's true, Your Honor. Why would they bother doing that? Well, it's his burden to establish. If he doesn't establish that he's got four things to show under State law. No, Your Honor. What I'm saying is he has – I prefer to think in terms of two different columns. Here are the three steps for Brady. Evidence is favorable. It's suppressed. It's material. That's the three steps you've got to meet under Brady. And the second column is the burden of proof that he has to show in State court for collateral relief. To get relief under State law. Correct. For a State personal restraint petition. That doesn't make the Supreme Court Commissioner's decision contrary to Supreme Court precedent. Okay. Let me narrow this a little more precisely. The three prongs of Brady as set out in Bagley and others, and including what the Washington Court of Appeals says, is it's favorable, it was suppressed, and there's prejudice. That's the – that's what the Washington Supreme Court describes the Brady obligation says. And then prejudice within the Brady context, and this comes from the Washington Court of Appeals and Federal cases as well, is that you have to have a reasonable probability that the result would have been different. That's the materiality test. That's the materiality and the prejudice factor. But if you show that, why shouldn't you get Federal habeas relief? Because in State court you have the burden of proof of showing actual prejudice. But that then would seem – that's right. You might have that, but that then is contrary to Federal law. You have made, here's the Federal standard, and I understand you saying that that's the State standard, but the State standard is higher. So you have taken the materiality and prejudice prong and said, under State law, you have to have actual prejudice. So I'm sorry, you lose. So you basically have eviscerated the third prong of Brady. Now, I'm not saying it's right or wrong for the State to have this standard in general, but at least as to Brady, I'm just having a little trouble figuring out why it isn't inconsistent. If that reasoning was followed, Your Honor, then every individual who saw a personal – who filed a personal restraint petition in the Washington State courts, assume it's a Brady issue, and lost, would have the same claim in this case. Washington Supreme Court Commissioner's decision was contrary to clearly established Federal law because he heaped on me this additional requirement of actual prejudice on top of the three-step Brady test. Yeah, no. All that he would have to say, Washington Supreme Court would say under Brady, it doesn't rise to the level of sufficient prejudice denied. I mean, that's all. You wouldn't give everybody a free pass home. You would just say under the Brady test, you still lose because I don't think that you would have gotten a different result at your trial. So, I mean, I don't think this is a hypothetical problem. You know, Commissioner Crooks has been there a long time. Yes. So it may be that this is just his format, you know, for doing these, but it seems to me that I'm just – that the standard he uses for you to say it's a State standard, I'm not sure why that sanitizes it from whether it's contrary to Federal law. Your Honor, Williams v. Taylor defines contrary to in two ways. The first one, I think, is the applicable one that we're discussing here today. Yes. Does the State court apply a legal rule which is contradictory to Supreme Court precedent? It is not. And Washington, the Court Commissioner, Commissioner Crooks, did not do so in this case either. He applied the State rule for a Petitioner to obtain State collateral relief. Applying a State rule is not going to be contrary to clearly established Federal law. And, again, if that was the case, then every Petitioner on a Brady claim who lost in the manner that Mr. Barker lost could raise the same claim before this Court or any Federal court. Well, in other words, the Commissioner has not ruled on the Brady claim from a Federal standpoint. He ruled on it only from a State standpoint. Aren't we required to consider it from a Federal standpoint? Yes, you are, Your Honor. Well, how do we know that the State supreme court has ruled on this question of the Brady violation with regard to prejudice? The Washington Supreme Court Commissioner certainly discussed the issues as to Brady in his decision. But applied a different standard than the Federal standard. No, Your Honor. He did not apply a different standard. I would respectfully disagree with the Court in that regard. He applied the State burden of proof. And I would point out to the Court that the district court indicated that the last reasoned decision in Mr. Barker's case, as I recall, wasn't the Washington court of appeals decision. Well, that's why I started there. But that's not what you told me. I mean, you're now seeing the problem. You said, no, no, no, it's both decisions. It's the ---- I quoted the statute. I understand. But that's the position the Attorney General's office is taking. So, you know, we can't run around the issue. And if the last reasoned decision is the court of appeals decision, that's one thing. But if you're relying on the Washington Supreme Court, which seems to in your brief, it seems to me that's another issue. Perhaps I went with the court of appeals. Maybe you want to tell us now which, if you want to rely on both, or one or the other. I am relying on the Washington court of appeals decision as the last reasoned decision in this case. I believe Judge Shea indicated that in his 30-some-odd-page order. When I was responding to the Court's question earlier, I was quoting the statute, 2254, as to whether the State court's decision was contrary to or equitably established federal law. In my view, my position has always been that the Washington court of appeals decision is the last reasoned decision in this case. I was responding to your question. Why did you say that it was the Supreme Court? Why have we been discussing all this? Why didn't you just say stop? That's not the decision we're reviewing. I said let's all get on the same page here. They're talking about the Washington Supreme Court. You're talking about the Washington Supreme Court. I've been reading the Washington court of appeals decision with care. Now you're saying it's the Washington court of appeals. So kind of is this your last and final answer on which decision? Yes. Okay. So in your view, in view of the Attorney General's office, we should look to the court of appeals decision as the last reasoned decision? Correct, Your Honor. Okay. Now, on a more factual issue, you know, I agree. I mean, it just seems to me generally that this guy was impeached six ways sideways. But this little chart is at least somewhat illuminating because it casts doubt on his ability to have made one of the confessions. What is your position? Because that obviously, it's these confessions and Mr. Abundis testifying about them that was different from trial number one. And we know Mr. Abundis is a bad guy and the jury knew he was a bad guy. But what if the confession couldn't have been made? So I would appreciate any comment you have on this chronology issue here. Even if the jury had heard about the second confession on June 14th, would it have cast doubt on Mr. Abundis' credibility? Well, counsel talked about Benn v. Lambert. And in that case, this Court talked about whether the undisclosed evidence would have made the difference in creating substantial doubt as to the And my answer to you, Your Honor, is it would have made no difference whatsoever. Mr. Abundis, as you put it, was impeached six ways from Sunday. The jury had significant substantial doubt as to whether he had any credibility whatsoever. Would it have made a difference? Would it have created a reasonable probability that the outcome would have been different? I would submit clearly not. Do you not see some difference between just saying, okay, the guy's a liar and the confession would have been physically impossible? So we don't have to figure out whether he's a liar. He's he's he couldn't the confession couldn't even have been made because of this chronology. It seems to me there's kind of a sort of a qualitative difference between the two arguments. So the difference would be the jury already heard that Mr. Abundis was a repeated liar. They already heard that. They already found out that he lied about his brother's name and his cousin's name. They knew the man was a repeated liar. So the Court's question is, would he have been an even bigger liar? Would his credibility further have been had reason to question by the jury? Well, it's kind of like this. I know this guy's a liar. But, my God, when somebody makes a confession, that really makes me stand up and say, I'm impressed by a confession with this specificity. Even though I know this guy's a liar, I maybe have to discount it some. But then if somebody said, yeah, but actually there was no way he could have even made the confession you testified to because he was already a repeated liar.  He was a repeated liar. He wasn't even the same physical proximity. That seems to be a little bit different to me, but maybe not. Okay. But does it result in a reasonable probability that the outcome would have been different? Okay. So that goes back to the Brady. Yes. Given the abundance of information that already came before the jury, and this case isn't Ben v. Lambert. What if, in fact, instead of there being a 32-hour window, what if, in fact, he had been in jail during the entire time that he maintained he got the confession? Wouldn't that be a different qualitative decision for the jury to make? If there had been less impeachment evidence that came before the jury, I would agree. But given the amount of impeachment evidence that came before this jury in Mr. Barker's case, I would disagree, Your Honor. No. There is no reasonable probability that the outcome would have been different. Even though it was impossible for him to receive the confession? That's Mr. Barker's theory, that it was impossible. In my hypothetical, he was in jail the whole time. Well, if he was in jail the entire time and made it physically impossible to receive the confession, I suppose, yes, hypothetically. But that's not the reality. That's not the facts of this case. So now we've got 32 hours. Correct. That, it seems to me, is qualitatively different than whether a person is really telling a lie or not, when you've got this possibility that, significant possibility, that it couldn't have happened. Well, let's assume that the, that Mr. Sanderson, Mr. Barker's defense attorney, was able to go before the jury in closing argument and argue that and say, in addition, what's the likelihood that this could have happened? Again, we fall back on the reasonable probability standard. I guess what I was trying to do was what Judge McKeon was trying to do, to get you to recognize there's a difference between the two. But I don't think you see one. I see a qualitative difference, Your Honor. But I would submit respectfully that, given the abundance of impeachment information, it would have made no difference. Well, we've made some progress, if you see a difference. You know, I just figured out what the difference is. And I'm not saying, I don't know how it tips in the end. But here's the difference, is that, you know, when you're just assessing credibility, it's pretty subjective, you know. I mean, he is a bad guy, so I believe him some, I believe him not. But if you have an objectively confirmable fact, you know, I see you in court today. I may be a liar, but if, in fact, you've never been in the state of Washington, that just seems to be a lot easier to verify that I'm a liar, other than just how I'm testifying. So, I mean, I think that's really what I was trying to get to, and probably wasn't very articulate in giving that. But I think it was, is that there is potentially an objectively identifiable fact. Now, it still needs to be factored into the Brady standard that you mentioned, and I don't know, you know, exactly where that will come out. But I think we'll hear, we've kind of gone over your time, because it's a more difficult case probably than it appears on the surface initially, because of all these little details once you get into them. So why don't we now hear from Mr. Barker's counsel on rebuttal. Thank you very much. Thank you, Your Honor. May it please the Court, my name is Leslie Wood. I'm a law student with the University of Washington Innocence Project Northwest Clinic here on behalf of Mr. Anton Barker. I would like to address a few of the issues discussed by the Respondent. First, regarding the last reasoned decision, our case is the exact procedural history as Riley v. Payne. I'd like to direct the Court's attention to Riley v. Payne at page 1316, where this Court looked at the State Supreme Court's decision which had denied review, thereby affirming the ruling and reasoning of the Commissioner who had rejected the constitutional claim. Ours is the exact procedural history. However, our analysis is still the same, that both opinions were contrary to and an unreasonable application of the law. In this case, adding an additional burden, as this Court mentioned, means that Mr. Barker still has yet to have his claim reviewed under the governing federal standard. The steep hurdle that has been added by the lower courts is directly analogous to the hurdles added in Bailey v. Ray and in Williams v. Taylor. Well, they didn't add that in the Court of Appeals. The Court of Appeals was quite faithful to the federal law, was it not? Yes. Yes, Your Honor. Well, however, our analysis regarding the unreasonable application is the same for both opinions. As mentioned, if we are looking at the Commissioner's opinion as the last reasoned decision, as in Riley v. Payne, the additional burden was added, and thus Mr. Barker's constitutional claim has not thoroughly been reviewed, and the application by the Court of Appeals was objectively unreasonable for several reasons. As the Respondent has argued today regarding whether Mr. Barker was — excuse me, Mr. Bundy's was impeached enough, and we want to remind the Court that there has never been any physical or forensic evidence linking Mr. Barker to this crime. In the first trial, the only alleged connection was the inconsistent witness testimony of a perpetrator wearing a baseball hat, face paint, and a handkerchief. It was based only on this evidence at the first trial that the first trial resulted in a hung jury, where the defendant with an eighth-grade education represented himself pro se. The Respondent has never denied that this was a weak case. This was all that that first trial was based on, was this one. Let me ask you about this chronology here, which — Yes, Your Honor. Do you get to this chronology by knowing about one of the convictions? Yes. Is it about one of the convictions that wasn't disclosed, or do you get there through some other means? Yes, through the documented evidence, which was also withheld by the State. There were, in addition to the four withheld convictions, one of which places Obundis in jail during this time, there was documented evidence of this probable cause hearing from June 14th that placed Mr. Obundis in jail at 1030, at the time that he alleges that the confession happened. That is documented evidence that was withheld by the State. But was this argument made to the lower courts? I mean, this is a little — this is a little bit different argument than you just withheld convictions, which go to, you know, what Mr. Rosen was talking about, your general credibility, which the guy had very little. So was this argument made that it would be physically impossible to have made the conviction — I mean, the confession? This argument has been made, and it is — this illuminates why both the court of appeals and Supreme Court decisions were objectively unreasonable, because they ignored this piece of evidence. They never reviewed this piece of evidence. This June 14th, not only this probable cause hearing, but the documented — Let me just be clear. If I go back into the record in the State court proceedings, this argument that because of this confluence of events that he couldn't have made the confession, I'll find that in the briefs? You'll find that in Mr. Barker's briefs. You're talking about June the 14th? June the 14th. We have a note here that in some of our research that at ER 566, it indicates that Bundy's did not testify that Barker confessed to him on that day. It said they talked, but that did not include a confession. That was — That was on June 14th. That's according to ER 566, which I don't have before me, and I don't know whether that's true or not. I would need to review. I don't have the record in front of me, Your Honors. That's — For the 1030, that's fairly specific. Do you have the site reference for when he allegedly heard the second confession? Yes. We have ER 566 that Mr. Barker talked to while in jail on June 14th about 10 o'clock, and that is Mr. Bundy's testimony. But that — talking to someone is different than hearing a confession. I'd need to find the — I would be quite disturbed if I were to find that this chronology doesn't accurately represent what the record states. So rather than taking your time now, the clerk has little pieces of paper for supplemental submissions, and if you can give us the record citation for the fact that there was a confession at 1030 or on June 14, and then also provide Mr. Rosen a copy of that location number as well. Yes, Your Honor. All right. You may proceed. I'll supplement that. I see that my time is running up at this point. I'd like to conclude, and we will provide the appropriate document numbers to this Court and to Mr. Rosen. Thank you. Thank you. Your Honors, Mr. Barker's conviction is not — not worthy of confidence, not in a system of justice. Mr. Barker asks that you prevent the system from being reduced to a win-at-all-cost battle. Instead, grant him what he has consistently requested, that it's simply a fair trial. We respectfully request that this Court grant his writ of habeas corpus, or in the alternative, grant him an evidentiary hearing on his claims of constitutional error. Thank you, Your Honors. Thank you. I'd also like to thank the University of Washington for providing counsel in these uncounseled cases. It is much help to the Court to be able to have a reasoned brief from both sides. We obviously get that, of course, from the Attorney General's office and appreciate the arguments of both counsel. Barker v. Fleming is submitted.
judges: Hug, Thompson, McKeown